663 F.2d 158
 213 U.S.App.D.C. 394, Energy Mgt. P 26,254
 TEXACO, INC., et al.,
v.
DEPARTMENT OF ENERGY, et al. Commonwealth Oil Refining
Company, Inc., Appellant.
TEXACO, INC., et al.
v.
DEPARTMENT OF ENERGY, et al. Federal Energy Regulatory
Commission, Appellant.
INDEPENDENT REFINERS ASSOCIATION OF AMERICA
v.
DEPARTMENT OF ENERGY, et al.
Commonwealth Oil Refining Company, Incorporated, Appellants.
CLARK OIL AND REFINING CORPORATION and Crown Central
Petroleum Corporation
v.
DEPARTMENT OF ENERGY, et al. Commonwealth Oil Refining
Company, Incorporated, Appellant
 Nos. 79-1643, 79-1652, 79-1725 and 79-1726.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 22, 1980.
Decided Dec. 2, 1980.
 
 Barbara J. Weller, Atty., Federal Energy Regulatory Comn., Washington, D. C., with whom Robert R. Nordhaus, Gen. Counsel and Jerome Nelson, Sol. and Jerome M. Feit, Atty., Federal Energy Regulatory Comn., Washington, D. C., were on the brief, for Federal Energy Regulatory Comn., appellant in No. 79-1652 and appellee in Nos. 79-1643, 79-1725 and 79-1726. Howard E. Shapiro, Atty., Federal Energy Regulatory Comn., Washington, D. C., also entered an appearance for Federal Energy Regulatory Comn.
 David Galbraith, Washington, D. C., with whom Fred W. Drogula, Washington, D. C., was on the brief for Commonwealth Oil Refining Co., Inc., appellant in Nos. 79-1643, 79-1725 and 79-1726 and appellee in No. 79-1652.
 Paul Wallach, Atty., Dept. of Energy for Dept. of Energy and Secretary of Energy, Washington, D. C., et al., amici curiae urging reversal in Nos. 79-1643, 79-1652 and 79-1725.
 Craig D. Miller, Washington, D. C., with whom Donald B. Craven, Washington, D. C., was on the brief for Texaco, Inc., et al., appellees in Nos. 79-1643, 79-1652, 79-1725 and 79-1726.
 Edwin Jason Dryer and Timothy J. Bloomfield, Washington, D. C., entered appearances for Independent Refiners Association of America, appellee in No. 79-1725.
 Before BAZELON, Senior Circuit Judge, and WALD and EDWARDS, Circuit Judges.
 Opinion for the Court filed by Senior Circuit Judge BAZELON.
 BAZELON, Senior Circuit Judge:
 
 
 1
 Since 1973, the Department of Energy ("DOE") and its predecessor agencies have regulated production and competition among domestic oil producer/refiners through the entitlements program. In 1977, the DOE Organization Act[1] provided, inter alia, that an independent entity-the Federal Energy Regulatory Commission ("FERC")-would review DOE's "denials of requests for adjustments" in individual refiner's entitlements.[2] Pursuant to its apparently limited statutory mandate, FERC declined to hear various producer/refiner's ("appellees") appeal of DOE's grant of adjustment relief to Commonwealth Oil ("Corco").
 
 
 2
 In this suit for a declaratory judgment and injunctive relief, the district court found that administrative due process and "fair play" required FERC to review DOE's grant of adjustment relief. Viewing FERC's interadministrative appellate review in the context of DOE's procedures and judicial review, we find that applicants for and objectors to adjustment relief need not have identical procedural opportunities at every stage of the administrative process. Accordingly, we reverse.
 
 I. The Regulatory Context
 
 3
 The entitlements program is part of DOE's system for regulating the production and allocation of petroleum.[3] Rather than merely regulating the price at which refined oil is sold, the entitlements program affects the costs of production. It has been described as a "cost-equalization" device, but equality in competition is only one of the policies pursued through the program.[4]
 
 
 4
 The program operates as follows. A producer/refiner needs one entitlement to refine one barrel of "old" oil.[5] Old oil tends to have relatively lower production costs than "new" oil.[6] The entitlements program operates in part to offset the competitive advantage enjoyed by refiners with relatively greater access to old oil. Each month, DOE allocates entitlements to individual refiner/producers. DOE also announces the extent to which each refiner/producer's previous month's production of old oil exceeded or failed to exhaust its entitlements. The over-producers are then ordered to purchase their needed entitlements from the under-producers, at a price fixed by DOE.
 
 
 5
 By manipulating entitlement allocations, DOE requires refiner/producers to share the benefits and burdens of disparate production costs. The entitlements program serves other regulatory goals as well: preserving small refiners; increasing domestic production; and, offsetting regional market distortions.[7]
 
 
 6
 DOE addresses generic issues of entitlement allocations in rule-making proceedings.[8] Section 501 of the DOE Act describes the procedures to be employed prior to the issuance of "rules, regulations, or (generic) orders."[9] DOE also is authorized to make adjustments in entitlement allocations on an individualized basis, "as may be necessary to prevent special hardship, inequity, or unfair distribution of burdens ...."[10]
 
 
 7
 Exception relief is an adjustment for the purposes of the DOE Act.[11] Exceptions can take the form of a reduction in a refiner's entitlement obligations or an increase in the refiner's allocated entitlements. Both forms of exception relief have the same impact on the successful applicant: the refiner can produce more old oil without buying entitlements, or it can produce the same amount of old oil and sell the unused entitlements. The effect of an exception on refiners other than the applicant depends, inter alia, on what the successful applicant does. If there is no increase in domestic crude production, there will be no increase in the total number of entitlements allocated through the program.[12] The effect of the exception under these circumstances is a shared reduction in other refiner's allocations, followed by a transfer of revenues from these refiners to the successful applicant.
 
 
 8
 Refiners seeking exception relief submit their applications and supporting materials to DOE. Parties which may be affected by the grant of an exception receive notice of the application either from the applicants or through the Federal Register.[13] DOE will then issue a proposed decision, which triggers a period for comment and objection by interested parties.[14] Parties which submit a statement of objections to the proposed relief have a right to present oral argument,[15] as well as an opportunity to move for an evidentiary hearing.[16] If DOE finds that there are unresolved issues of fact raised by the objections, it must order a hearing.[17] Objecting parties would then have the right to present evidence and cross-examine witnesses.[18]
 
 
 9
 During the pendency of this quasi-adjudicative procedure, DOE may grant an application for interim relief if the applicant can prove its probable success on the merits of the underlying application and a favorable balance of equities.[19] An interim grant of exception relief has effect only until the DOE issues its final decision on the application.
 
 
 10
 FERC's role in the entitlements program begins after DOE rules on a request for an adjustment. Section 504(b)(1) of the DOE Act provides:
 
 
 11
 If any person is aggrieved or adversely affected by a denial of a request for adjustment under subsection (a) of this section such person may request a review of such denial by (FERC) and may obtain judicial review in accordance with this subchapter when such a denial becomes final.
 
 
 12
 This lawsuit turns on the construction of this jurisdictional provision. There is no dispute that the entitlements program and the adjustments process conclude with judicial review of all DOE orders granting or denying adjustment applications.[20]
 
 II. Corco's Application
 
 13
 After rule-making proceedings, DOE announced various administrative actions and regulations designed to stimulate the production of heavy California crude.[21] DOE recognized that the trans-Alaska pipeline had created a crude oil glut in the Western states, and sought to provide economic incentives for the production and transportation of California crude to Eastern refineries. DOE's program contemplated the use of exception relief from entitlement obligations.[22]
 
 
 14
 Soon after DOE's announcement, Corco petitioned for exception relief.[23] DOE issued a proposed order granting Corco's application.[24] Some of the appellees filed objections with DOE. Before the adjudicative process was completed, Corco obtained interim relief,[25] which provided an adjustment in Corco's entitlements until the issuance of a final order.[26]
 
 
 15
 Appellees appealed the interim order to FERC, which dismissed for lack of jurisdiction. FERC cited newly issued administrative regulations limiting its appellate jurisdiction to "denials of adjustments."[27]
 
 
 16
 The court below vacated the order dismissing the appeal, and remanded the case to FERC. Although § 504(b)(1) speaks in terms of "denials," the court found that the term "adjustments" encompassed more than exception relief. Section 504(a) provides:
 
 
 17
 The Secretary ... shall provide for the making of such adjustments to any rule, regulation or order described in section 7191(a) of this title ... as may be necessary to prevent special hardship, inequity, or unfair distribution of burdens, and shall by rule establish procedures which are available to any person for the purpose of seeking an interpretation, modification, or rescission of, exception to, or exemption from, such rule, regulation or order. The Secretary ... shall additionally ensure that each decision on any petition requesting an adjustment shall specify the standards of hardship, inequity or unfair distribution of burden by which any disposition was made ....[28]
 
 
 18
 The court ruled that requests for § 504(b) adjustments included applications for a § 504(a) rescission. It then found that DOE had effectively rejected appellees' request for a rescission of the exception granted Corco, and thus DOE had denied appellees' "request for an adjustment" for the purposes of § 504(b)(1). This reading of the statute was informed by a House-Senate conference report on the DOE Act, which stated: "Congress always intended that the notions of fair play and due process be followed in the administrative process."[29] The court observed, "(o)ne could hardly call it 'fair play and due process' for Congress to give applicants for exceptions a manner of administrative review, but not objectors to the exceptions."[30]
 
 
 19
 Before the proceedings below were completed, DOE issued a final order granting exception relief to Corco,[31] which incorporated the grant of interim relief, and provided for future relief, but at a somewhat reduced level. Appellees have appealed the DOE final order to the District Court, which has stayed its review pending this appeal.
 
 III. Mootness
 
 20
 At various points in this litigation, one or more parties has contended that this case is moot. They have noted that the interim order expired with the issuance of the final order, and no exception relief was actually effected before the issuance of the final order. Notwithstanding these considerations, we decline to dismiss this appeal on mootness grounds.
 
 
 21
 The final order incorporated the interim order, but it did not affect its integrity or alter the relief which it provided.[32] Cf. Air Line Pilots Ass'n, Int'l v. C. A. B., 509 F.2d 964 (D.C.Cir.1975). Although DOE ultimately granted Corco less relief than was anticipated in the proposed order, the final order did not reduce the relief granted during the interim period.
 
 
 22
 Assuming arguendo that the interim order was merged into the final order, the appealability of interim adjustments is an issue capable of repetition, yet evading review.[33] Before this court could ever pass on FERC's jurisdiction over an interim order, it is likely that DOE would issue a final order which superceded it. Moreover, the public interest in resolution of FERC's appellate jurisdiction is compounded by the conflicting authority in the district courts of this circuit.[34] Accordingly, we proceed to the merits of this appeal.
 
 IV. Statutory Language
 
 23
 Although § 504(b)(1) limits FERC's appellate jurisdiction to "denials of ... adjustments," appellees insist that Congress intended FERC to review adjustments grants. They contend first, that "denials" should be construed to include grants, in light of the administrative practice contemporaneous with the passage of the DOE Act[35]; and second, that "adjustments" in § 504(b) (1) should be construed to incorporate § 504(a) rescissions, which should be deemed to include appeals from granted exceptions. In view of the language and legislative history of § 504, we find these contentions to be without merit.
 
 
 24
 A. "Denial"
 
 
 25
 The legislative history of § 504 provides no basis for concluding that Congress meant something other than what it said.[36] Appellees note, however, that before the DOE Act was passed, DOE's predecessor agency-the Federal Energy Administration ("FEA")-reviewed grants as well as denials of adjustments, notwithstanding a statutory obligation to review only the latter.[37] Appellees contend that "denials" in the DOE Act should therefore be given a broad construction.
 
 
 26
 There is no evidence that Congress approved of the FEA's practice when it passed the DOE Act. Moreover, we hesitate to assume that Congress expected FERC to implement the DOE Act in the same fashion that the FEA had implemented earlier statutes. In the DOE Act, Congress restructured the exceptions process. The FEA had provided broad appellate review of its own orders. At issue here, on the other hand, is the scope of interadministrative review. Unlike the FEA, FERC does not have general authority over the entitlements program and the exceptions process.[38] The deference usually accorded an agency's construction of a statute is "heightened where ... the regulations at issue represent (the agency's) initial attempt at interpreting and implementing a new regulatory concept."[39]
 
 
 27
 B. "Adjustments"
 
 
 28
 The court below found not that "denials" encompassed grants, but that requests for "adjustments" included appeals of granted exceptions. We find this an untenable construction of § 504.
 
 
 29
 Section 504 provides a substantive standard for adjustments: "special hardship, inequity, or unfair distribution of burdens."[40] This standard is rooted in the legislative history,[41] and is further reenforced in the final provision of § 504(a), which requires DOE to "specify the standards of hardship, inequity, or unfair distribution of burden by which any disposition (is) made."[42]
 
 
 30
 According to appellees, however, adjustments include not only exception relief but also "an interpretation, modification, or rescission of" a granted exception. They contend that an applicant for rescission of an exception need not prove that it was subject to "special hardship."[43] This construction creates two classes of adjustments, one tied to a substantive standard, the other not. In the face of Congress's repeated invocation of the substantive standard for adjustments, appellees have not pointed to any support in the statute or legislative history for this favored sub-class.
 
 
 31
 Moreover, the § 504(a) remedies, such as rescissions, which appellees now lodge under the adjustments rubric, must be considered in their statutory context. As § 501 makes clear,[44] § 504(a) alludes to rescission of a "rule, regulation or (generic) order." If the exception granted Corco was indeed a generic order, § 501[45] required DOE to employ rule-making procedures.
 
 
 32
 This result seems to violate the intent of Congress in dividing section 501 from 504.[46] Appellees have already participated in the § 501 rule-making proceedings which preceded DOE's decision to entertain applications for exception relief from refiners of California crude. Their reading would circumvent the distinction between rule-making and adjudication which Congress intended to draw in the entitlements program. Accordingly, we find that Congress did not intend "requests for adjustments" to include appeals from grants of adjustments.
 
 V. Due Process and Fair Play
 
 33
 Notwithstanding the apparent intent of § 504, appellees contend that due process and fair play require us to reject FERC's construction of its jurisdictional mandate. They note that, unlike the final adjustment order, the interim order issued here preceded the quasi-adjudicative proceedings held by DOE. The constitutional challenge, then, is levelled at the ex parte interim order of adjustment relief.
 
 
 34
 "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.' " Mathews v. Eldridge, 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976). Appellees do not question that DOE afforded them a meaningful opportunity to be heard before the issuance of the final order. Like the final order, the interim order is subject to judicial review after the DOE quasi-adjudicative process is completed.[47] Because the factual issues underlying the grant of interim relief are generally the same as those underlying the final order, a record adequate for meaningful review of one will be adequate for review of the other.[48]
 
 
 35
 The focus of constitutional concern must then be on the timing of appellees' opportunity to contest the interim order. Analysis requires consideration of, inter alia, "the private interest that will be affected by the official action ... and the risk of an erroneous deprivation of such interest through the procedures used...." 424 U.S. at 335, 96 S.Ct. at 903.
 
 
 36
 The private interest at stake here is qualified by the remedies available to objecting parties during the pendency of an interim order. If the interim exception causes "special hardship, inequity, or unfair distribution of burdens,"[49] an adversely affected party can petition for an adjustment and interim relief under § 504. Where enforcement of an interim order would cause irreparable injury, an objecting party may obtain a stay from DOE pending judicial review of the final order.[50] Thus, only where the effect of an interim adjustment is neither irreparable nor unduly burdensome will an affected party be obliged to await a final order before receiving meaningful review. In light of the "capacities and circumstances of those who are to be heard," Goldberg v. Kelly, 397 U.S. 254, 268-69, 90 S.Ct. 1011, 1021, 25 L.Ed.2d 287 (1970), we do not find this scheme inconsistent with due process.[51]
 
 
 37
 Finally, appellees contend that FERC's construction of § 504 gives applicants for exception relief an opportunity for review unavailable to parties objecting to the exception, and thereby violates Congress's concern for "fair play." We disagree.
 
 
 38
 An applicant for exception relief has a qualitatively greater and more direct interest in the DOE decision than an objecting party. An applicant claims to be suffering a special hardship, but objecting parties' interests are contingent, shared, and indirect.[52] Moreover, the legislative history of the DOE Act suggests that Congress was more concerned with erroneous denials than erroneous grants of exception relief.[53] Under these circumstances, we find the regulatory scheme to be both fair and rational.
 
 
 39
 The judgment of the district court is reversed, and FERC's order dismissing the appeal for lack of jurisdiction is ordered reinstated.
 
 
 40
 So ordered.
 
 
 
 [1]
 Pub.L. 95-91, 91 Stat. 565 (August 4, 1977) ("DOE Act")
 
 
 [2]
 Section 504(b)(1) of the DOE Act, 42 U.S.C. § 7194(b)(1) (1978), provides:
 If any person is aggrieved or adversely affected by a denial of a request for adjustment under subsection (a) of this section such person may request a review of such denial of the Commission and may obtain judicial review in accordance with this subchapter when such a denial becomes final.
 
 
 [3]
 See 10 C.F.R. § 212.71 (1980) (price controls also part of regulatory scheme). See generally Cities Service Co. v. FEA, 529 F.2d 1016 (Em.App.1975), cert. denied, 426 U.S. 947, 96 S.Ct. 3166, 49 L.Ed.2d 1184 (1976)
 
 
 [4]
 Texaco, Inc. v. Department of Energy, 460 F.Supp. 339, 341 (D.D.C.1978). See pp. 161-162 infra (other goals of program)
 
 
 [5]
 Old oil is domestic crude produced from property in operation in 1972, in amounts less than or equal to the 1972 production level from that property
 
 
 [6]
 New oil is crude oil produced in excess of 1972 production levels from properties in operation in 1972, as well as newly discovered and foreign crude
 
 
 [7]
 One such distortion was created by the trans-Alaska pipeline, which created an oil glut in the Western states. 43 Fed.Reg. 26540 (June 20, 1978)
 
 
 [8]
 42 U.S.C. § 7191 (1978). DOE conducted rule-making proceedings before announcing its plan to increase California crude oil production through, inter alia, adjustments in the entitlements program. 43 Fed.Reg. 26540 (June 20, 1978)
 
 
 [9]
 42 U.S.C. § 7191 (1978)
 
 
 [10]
 42 U.S.C. § 7194(a), reproduced at p. 9 infra
 
 
 [11]
 See S.Rep.No.95-367, 95th Cong., 1st Sess. 84 (1977) ("exceptions to and exemptions from a rule are included in adjustments ....")
 
 
 [12]
 The total number of entitlements allocated throughout the system is a function of the national domestic crude oil supply ratio, which is the ratio of the volume of old oil included in all refiners crude oil receipts, less adjustments (such as the exception granted Corco), divided by the total volume of crude oil refined during the period in question. When exception relief is granted, the national domestic crude oil supply ratio will decline unless there is a corresponding increase in the volume of old oil (usually domestic crude) produced. See Affidavit in Support of Motions for Temporary Restraining Order and Preliminary Injunction (A. D'Antonio) (August 8, 1978)
 
 
 [13]
 10 C.F.R. § 205.53 (1980)
 
 
 [14]
 10 C.F.R. § 205.56 (1980) had been issued as a proposed rule, see 42 Fed.Reg. 47211 (September 20, 1977), when DOE considered Corco's application
 
 
 [15]
 10 C.F.R. § 205.69 (1980) had been issued as a proposed rule, 10 C.F.R. § 205.64 (42 Fed.Reg. 47211 (September 20, 1977)), when DOE considered Corco's application
 
 
 [16]
 10 C.F.R. § 205.64 (1980) had been issued as a proposed rule, 10 C.F.R. § 205.58 (42 Fed.Reg. 47212 (September 20, 1977)), when DOE considered Corco's application
 
 
 [17]
 Id. See also 10 C.F.R. § 205.62 (proposed) (42 Fed.Reg. 47212 (September 20, 1977))
 
 
 [18]
 10 C.F.R. § 205.68 (1980) had been issued as a proposed rule, 10 C.F.R. § 205.63 (42 Fed.Reg. 47212 (September 20, 1977)), when DOE considered Corco's application
 
 
 [19]
 10 C.F.R. § 205.69A (1980) had been issued as a proposed rule in somewhat different form, 10 C.F.R. § 205.65 (42 Fed.Reg. 47213 (September 20, 1977)), when DOE considered Corco's application
 
 
 [20]
 See 42 U.S.C. § 7192(a)
 
 
 [21]
 See 43 Fed.Reg. 26540 (June 20, 1978)
 
 
 [22]
 DOE also announced that it would grant export licenses to producers of Western residual fuel oil, and that it would alter entitlement benefits to compensate for the economic disadvantages suffered by producers of California heavy crude oil. J.A. 26
 
 
 [23]
 DOE announced the results of its rule-making proceeding on June 20, 1978, and Corco filed an application for an exception two days later
 
 
 [24]
 J.A. 28 (June 30, 1978)
 
 
 [25]
 The interim relief was granted on July 20, 1978
 
 
 [26]
 The interim order provided that the relief it afforded was final for the purposes of DOE's adjudicative process, i. e., regardless of DOE's disposition of Corco's application for and the plaintiffs' objections to adjustment relief, the relief provided by the interim order would stand. The interim order guaranteed Corco entitlement benefits during the period beginning with the order's issuance and ending with the final order, or 60 days, whichever came first. J.A. 242
 The order provided that it was appealable pursuant to 10 C.F.R. § 205.67 (superceded (42 Fed.Reg. 47213 (September 20, 1977)). That regulation, however, provided that after October 1977, all appeals of DOE decisions on adjustment applications would be filed with FERC in accordance with the procedures to be established by the Commission. FERC's regulations, issued days before FERC's disposition of the plaintiffs' appeal, do not provide for review of granted exceptions. 18 C.F.R. § 1.40(a) (43 Fed.Reg. 35909 (August 8, 1978)).
 
 
 [27]
 Id
 
 
 [28]
 42 U.S.C. § 7194(a) (1978)
 
 
 [29]
 S.Rep.No.95-367, 95th Cong., 1st Sess. 86 (1977)
 
 
 [30]
 Texaco, Inc. v. Department of Energy, 460 F.Supp. 339, 345 (D.D.C.1978)
 
 
 [31]
 DOE's final decision was issued on September 12, 1978. The District Court remanded the case to FERC on August 29, 1978, but entertained a motion for reconsideration, which it denied on November 14, 1978. J.A. 414-15
 
 
 [32]
 On March 8, 1979, DOE issued a supplemental order providing for an adjustment in Corco's entitlement benefits to recapture excess benefits received by Corco during the period governed by the interim order. The interim order provided that it would be "effective regardless of the ultimate determination reached with regard to the ... Application for Exception," but that it could be modified "upon a determination that the factual basis underlying the exception application (was) incorrect." J.A. 242
 
 
 [33]
 See Sosna v. Iowa, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975); Southern Pac. Term. Co. v. ICC, 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911). See also Alton & So. Ry. Co. v. International Ass'n of Mach. & Aerospace Workers, 463 F.2d 872, 878-79 (D.C.Cir.1972) (public interest in assuring review is key element of Southern Pacific Terminal doctrine)
 
 
 [34]
 Compare Bonnaffons v. Department of Energy, 492 F.Supp. 1276 (D.D.C.1980) (Gesell, J.) with Texaco v. Department of Energy, 460 F.Supp. 339 (D.D.C.1978) (Richey, J.)
 
 
 [35]
 Cf. Gelman v. Federal Election Comm'n, 631 F.2d 939 (D.C.Cir.1980) (administrative practice relevant to statutory interpretation)
 
 
 [36]
 The conference report simply paraphrases the statutory language:
 (T)he requirements for specifying the standards upon which any adjustment decision is made is included, and requests for review of adjustment denials will be taken to the Commission.
 S.Rep.No.95-367, 95th Cong., 1st Sess. 84 (1977).
 
 
 [37]
 The FEA heard appeals from "any person aggrieved" by any order "granting or denying" an application for an exception, see 10 C.F.R. § 205.58 (superceded). The Federal Energy Administration Act of 1974, however, authorized appeals only for persons aggrieved by "denials" of requests for adjustment, see § 7(i)(1)(D) of the Federal Energy Administration Act of 1974, 15 U.S.C. § 766(i)(1)(D), as amended by § 104 of the Energy Conservation and Production Act of 1976. See also § 207(b) of the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note, incorporated by § 5 of the Emergency Petroleum Act of 1973, 15 U.S.C. § 754 (1976) (denial of request for "such action")
 
 
 [38]
 An agency with plenary authority over a process can experiment with different forms of access to its decisionmaking. At the inception of the entitlements program, the FEA did not provide the degree of access now offered by DOE to parties interested in the initial administration decision on an adjustment application. The FEA did, however, offer these parties ample opportunity for intra-administrative appellate review. Before it was succeeded by DOE, the FEA recognized the value of increased participation by affected parties in the initial administrative decision. See 42 Fed.Reg. 47210 (Sept. 20, 1977) (purpose of regulations is to produce more fully developed administrative record)
 
 
 [39]
 Atchison, T. & S. F. Ry. Co. v. ICC, 580 F.2d 623, 629 (D.C.Cir.1978). See Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796 (1933)
 
 
 [40]
 42 U.S.C. § 7194(a) (1978)
 
 
 [41]
 The conference report reads:
 The Senate bill provided for the making of adjustments ... necessary to prevent special hardship, inequity or unfair distribution of burdens.... The House amendment .... also provided that the Secretary must specify the standards upon which any adjustment decision is made....
 ....
 (A)djustments should be granted ... whenever an applicant meets any one of the three grounds for relief ... (and relief should be granted in an amount) necessary to alleviate the special hardship, inequity, or unfair distribution of burdens.
 S.Rep.No.95-367, 95th Cong., 1st Sess. 84 (1977).
 
 
 [42]
 42 U.S.C. § 7194(a) (1978). See also note 41 supra
 
 
 [43]
 If the plaintiffs could meet the substantive standard, they could petition for adjustment relief, as Corco did
 
 
 [44]
 Section 504(a) refers to a rescission of "such" rule, regulation or order. The "such" refers to the "rule, regulation or order described in section 7191(a) (§ 501 of the Act)."
 
 
 [45]
 The plaintiffs did not contend and the court below did not find that the Administrative Procedure Act, 5 U.S.C. § 551 (1978), required DOE to employ rule-making proceedings before granting Corco exception relief
 
 
 [46]
 We do not decide whether the APA, see note 45 supra, or administrative due process requires DOE to follow rule-making procedures in the adjustments process. For our purposes, we conclude only that Congress intended to distinguish between rule-making and the adjustments process
 
 
 [47]
 The latest DOE regulations suggest that interim orders are not reviewable until the issuance of the final order, see 10 C.F.R. § 205.69A(d) (1980). In any event, meaningful review would appear to be impossible without a fully developed record, which will be available only after the adjudicative process before DOE is completed
 
 
 [48]
 An applicant for interim relief must show probable success on the merits of the underlying application and a favorable balance of equities. Since the underlying application itself implicates equitable issues, it would appear that the interim order could be reviewed on the record underlying the final order. Where the record is not adequate, remand to DOE would be appropriate
 
 
 [49]
 42 U.S.C. § 7194(a) (1978)
 
 
 [50]
 10 C.F.R. § 205.125 (1980). An identical provision existed during the pendency of Corco's exception application
 
 
 [51]
 In addition to the private interest affected by official action and the risk of an erroneous deprivation of such interest, Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976) requires consideration of the Government's interest in avoiding additional procedural requirements. A record of the Government's interest in providing interim relief to Corco is found in the interim order
 DOE is anxious to expand the market for California crude oil in order to ... maintain ... existing production operations. The expeditious treatment of the Corco application is an indication of the DOE's strong belief that immediate action is necessary to alleviate the difficulties being experienced by some California producers. The positive impact on this situation which the DOE hopes to achieve through the approval of exception relief in this proceeding would be delayed, adversely affecting California crude oil producers, if interim exception relief is not approved. In view of the DOE's commitment to prompt affirmative action with respect to the California producers, and in view of the strong factual showing made by Corco ... we believe some form of exception relief will ultimately be granted .... (W)e also believe that the intent of the Proposed Decision would be significantly frustrated if the implementation of that decision were to be delayed in its entirety pending consideration of the Statements of Objection.
 J.A. 238 (emphasis supplied).
 
 
 [52]
 See pp. 161-162 supra. If a granted exception is accompanied by an increase in the domestic crude oil supply, the national crude oil supply ratio will be unaffected by the exception, and the objecting parties will suffer no loss in allocated entitlements
 
 
 [53]
 The criteria for adjustments included in both the House and Senate bills are identical to those included within the original Federal Energy Administration Act of 1974. Their reenactment, however, should not be taken as a validation of FEA's narrow application of the standards.... The Managers want to emphasize that adjustments should be granted, consistent with the other purposes of the relevant Acts, whenever an applicant meets any one of the three grounds for relief ... including retroactive relief where fairness and the public interest requires
 S.Rep.No.95-367, note 29 supra, at 84-85 (emphasis supplied).